We'll hear argument next in Case 12-1173, Marvin Brandt Revocable Trust v. United States. Mr. Lechner. Mr. Chief Justice, and may it please the Court, if upheld, the decision below will upset 100 years of property law entitled to perhaps a million acres of land based upon an implied reversionary interest that the government recently created. I'd like to make three points. First, the decision below violates Leo Sheep, where this Court rejected the government's attempt to create a property interest through implication and reaffirmed that the government does not retain any interest not expressed or reserved in the patent or the granting statute. Two, the decision below is contrary to both the government's argument and this Court's ruling in Great Northern that 1875 rights away are easements and not fees. And finally, the decision below is inconsistent with the Department of Interior's longstanding interpretation that the 1875 Act granted only an easement. It is axiomatic that the highest evidence of title in this country is a patent from the government. When the government issues a patent, it divests itself of title, except for those interests expressly reserved. Here, the patent did not reserve any interest in the 1875 Act rights. Scalia, you're not reading this, are you? That's all right. Here, the patent did not reserve any interest in the 1875 Act right away. Yet the government knew how to reserve interest at that time because it reserved the interest for ditches and canal and reserved the right to two forest service road when it issued the patent. The fact that some interests were reserved by the government in 1976 shows that other interests were not. Under Section 1912, the government did reserve an interest for a public highway. Is that correct? No. No? 1912, Section 1912 has to be read in conjunction with this Court's decision in Northern Pacific v. Townsend and Stringham. And in those decisions, this Court held that railroad rights of way were limited fees with implied reversionary interest. The patent you talk about, I'm not recalling it exactly, it had some – it mentioned the railroad interest, right? Yes. It mentioned it in the context of that Brandt's title is subject to those rights for railroad purposes as had been granted to the railroad under the 1875 Act. So it didn't characterize it as either an easement or a fee with an implied reverter. That it was subject to those rights for railroad purposes as had been granted to the railroad sounds like it was granted subject to a servitude. Rights for railroad purpose sounds like a servitude. And, of course, that's how the Department of Interior interpreted it at the time that these 1875 Act rights of way were easements. Following its longstanding interpretation, plus this Court's ruling in Great Northern, that these were easements. And at the time, that regulation was the law of the land, and that's – that controlled the title that Brandt got at the time. Breyer. What they're saying, I think the government's point is, the other side is saying – and I don't remember the term, my property law. It was – what's the right term? You grant to A, Blackacre, to A and his heirs. It's a fee simple, but it's subject to a shifting – it's subject to divestiture, subject to a condition subsequent. What's the right term? Or it shifts the – it shifts it back. A defeasible fee? Or implied conditional reverter? There could be. There was a technical term used to have. But anyway, that's what they're saying. And they're saying that that's for purposes of who owns the land, the mineral rights, it's treated as an easement. But for purposes of deciding who it reverts to, it's treated as a fee subject to a shifting use or whatever you call it, subject to – what did you say? Subject to a – To a right of revert. Yeah. Yes. But that's similar to the argument that the government made in 1942 in Great Northern, the limited fee in the South. It's different in this respect. It's different that there they were talking about who owns the mineral rights. So for those purposes, they say it's treated like an easement. But for who gets the reverter, it's drifted like a shift of the fee. Oh, that's nice. Do you know of any other real estate thing where it's an easement for one purpose and a fee for another? The government absolutely denied in Great Northern, didn't it? That was the government's case. This was not a fee. Exactly. They didn't say it's, you know, for some purposes it is. They said it was not a fee. And that's what the Court held, in accordance with what the government wanted, right? Correct. And that case has been around for how long? 72 years. And the case explicitly says it's an easement. And people have been buying and selling real estate, I assume, in reliance on that case for that entire period of time. And now the government has this new theory that for some purposes it's a fee, for some purposes it's an easement. That's not what Great Northern said. No, but I think it's important that the government — the argument that the government is making today is similar to their alternative argument that they made there in Great Northern, saying, okay, well, if it's not an easement, then it's a limited fee in the surface. This Court in Great Northern did not even address that alternative argument, which shows how strongly this Court in Great Northern believed it was just an easement. And this belief was just an easement. They're not — they're not really — well, maybe it's all right to say they're alternative arguments, but they're mutually exclusive arguments. I mean, they're alternative in the sense that they led to the same result, but the one argument is this is A and the other argument is this is not A. Yes, they'd be mutually exclusive. All right. We have a brief here from the cities, and they point out that, of course, there is reliance on your side. I believe you're absolutely right. But they say there's also a lot of reliance on the other side because cities have highways and they've — or States have, and they've converted it to use under patents or under statutes that the United States gave them that right. And all those are going to be invalid if you win. Now, what's your response to that? They would all — I'm not sure that they would be invalid, necessarily. Why? Well, I'm not — I don't know where all the city public highways' interests are vis-a-vis the — how the land was originally patented. It could have been originally patented in a town site plot or something like that, as opposed to here, where it was originally patented to one — under one patent, and I'm not sure how all the city's property was acquired. I assume your answer would be that if it's a choice between disappointing people who properly relied on the law and disappointing people who were not following the law, it's clear who should take it in the neck. It's the latter, isn't it? Absolutely. Plus, the cities also have the power of eminent domain. And if they would want one, a public highway, they certainly could condemn one. Ginsburg I thought the cities were relying on Section 912 as applied to the 1875 Act. That's what they — that's what the cities were relying on. But you must keep in mind that Section 912 did not alter or amend the 1875 Act. So the nature of the grant in the 1875 Act must be looked through the eyes of Congress in 1875. In 1922, when Congress passed Section 912, Congress was grappling with what to do with these isolated strips of land that would be administratively burdensome to manage. And they said — well, originally they said, well, let's give them to the settlers because they're the ones entitled to in the first place. And then as an afterthought, they said, well, let's put these as a public highway. But they did not amend the grant under the 1875 Act or alter the amended grant. Ginsburg Well, can you explain to me something about that 1875 Act? We know that until 1871, these railroad rights-of-way were considered to leave the government in the position of having a reversionary interest. Waxman Correct. Ginsburg And I don't see anything in the 1875 Act statute. There was an end to the giving away of large — large quantities of land to the railroad. And so that was out. But what is there in the 1875 Act that changes the right-of-way from what it had been up until 1871? Waxman As the government argued in Great Northern and as this Court adopted that argument, the key provision in the 1875 Act is Section 4, which reserved the right to Congress to dispose of the land's underlying 1875 rights-of-way to settlers. And this was a reflection of the change of policy in 1871, because that's where the Congress changed its policy to — in an effort to secure homesteads to actual settlers as opposed to benefiting the railroads. And Section 4, as this Court said in Great Northern, after language to demonstrate a conveyance of an easement would be hard to find. But the railroad wasn't benefited by the — under the 1871 understanding of the right-of-way. The one that was benefited was the government. The government got back the land. And so it's not — we're not going to — we're going to stop giving land to the railroad, yes. But the beneficiary that is losing out under your interpretation is the government. But it's not only my interpretation, it's the interpretation of the Court in Great Northern that it was an easement. And this Court was not — this Court in Great Northern knew the difference of the word easement and knew what the significance of using that term would mean, and so did the government at the time. Kennedy, there were points along the right-of-way where the railroad needed a station or a wider area for water towers and so forth, and it usually could receive those by simply filing a patent if it was within a permitted zone, if it was within a — if it was — if they were 20 miles equidistant or something like that. How did they get those additional lands? One way they could do it was to condemn them. But absent condemnation, could they just receive them from the government? Well, under the 1875 Act, yes, the Congress did provide for station grounds. The railroad could secure station grounds by filing a map of the station grounds with the local land office, and once the Secretary approved, then they would acquire the station grounds. But the nature of the grant that they acquire on the station grounds is the same as for the right-of-way, and that's merely an easement. Kennedy, so it's — so it was clear at the time of the grant that it was on the — that what was granted was coextensive with what the right-of-way was, what the railroad right-of-way was? Yes, and that was how the Department of Interior originally interpreted it in 1888, as the railroad didn't get a fee in anything, it got a right — it got an easement in the railroad — in the right-of-way and in the station grounds. Are there any instances in which the railroad can keep its station even if it abandons the right-of-way, or does the station fall with the right — when the right-of-way is abandoned? I think the right — the station grounds are tied to the right-of-way, so if you abandon the right-of-way, the station grounds would also be extinguished and unburden the underlying fee. Alito, could I ask you again about section 912? Your patent says that it is subject to those rights for railroad purposes as have been granted to the railway company in particular and its successors and assigns. Now, that was — that patent came after the enactment of 912, and 912 clarifies the rights of — or changes the rights of railroad companies and says that if they abandon property within one year, after that, there can be a public highway established on that — on that property. So why wasn't your patent subject to that? Well, first, I don't — 912 did not change the grant to the railroad. 912 applies if the government has any remaining interest in the right-of-way. Well, you didn't get your property from the railroad. You got it from the government. Correct. You got a patent from the government. So the question is, what were they conveying to you? And if you read the patent in connection with 912, isn't it clear they're conveying to you, arguably, everything other than this right to have a public highway established on that land when it was abandoned by the railroad? They were conveying it subject to those rights for railroad purposes, or there's a specific language in it. And the 912 does not create a reservation, doesn't create a right of reverter. It was simply to deal with what they were going to do with these strips of land upon abandonment, because at the time, that's when abandonment railroads first began. Congress was worried we were going to have these isolated strips. It didn't change the 1875 Act. It didn't change the previously granted rights-of-way to expand the scope of them. But when they were abandoned and they came back under the law at the time that the government said, okay, well, if you want to establish a public highway, that's fine, otherwise it's going to go, it's going to inure to the benefit of the settler. But it didn't change the nature of the grant, it didn't change the 1875 Act, it didn't create it, it did not create an interest that wasn't there before. It was just how to deal with the interest that the Congress thought it had after this Court's decision in Townsend and Stringer. Alito, I still don't understand it. You say this was purely an easement, all right? So that means that when there's an abandonment, the government has complete title to the property, right? They convey that property to you, but before they do that, they say that there's this reservation of rights with respect to the establishment of a highway. I'm, I'm, one, well, I'm, I'm, I'm troubled. Under, under your hypothetical, the government still owns the underlying land when the railroad's abandoned. So when the railroad is abandoned, the two estates merge. There, there was one. That's your argument, isn't it? Well, I think that's the argument under the common law, too, is, is, is, is what they merge. Yeah, okay, it may be, it may be a good argument. But that's your, that's your argument. They merge. Breyer. 912 says that when the railroad abandons a piece of the right-of-way, okay, it then says that the interests of the United States, all right, title and interest in the State of the United States shall be vested in the town that builds Iowa. Your point is, that's true, but where they previously, where they have previewed where they have given the, where they conveyed it to a private person, they didn't have any right title and interest, because on abandonment, it was simply an easement. And on abandonment, that goes to the property owner who owns the, the land on either side. Is that, I mean, it's, your point is that the United States didn't have any right title and interest on the abandonment unless the United States continued to own the property. Correct. All right? So that, that is your point. They can't convey what they don't have. Correct. And there's Let's take this in a normal easement situation. I have an easement to go through your backyard to get to the street. Can I assign that easement to another person so that the, the person who buys my home can now walk through your backyard? In, in certain circumstances, yes. So what's wrong with the concept that when this land was given to you as a railroad right-of-way, when it's abandoned that the railroad, in essence, under 1912 and under the 1922 Act, that you are giving that easement to the U.S. to use as a right-of-way? And so whether it's a trail or a highway or any of the other items that are specified in the statute, that, that easement is continuing to be used by the person who gave it, which was originally the U.S. And your patent was given subject to that easement, to that right-of-way. It was subject to those rights for railroad purposes, correct. Well, what was the language of the patent? Subject to those rights for railroad purposes as it had been granted. Was, was that the exact language? I thought it was for a right-of-way. Exact language. On page 78 of the Petitioner's Appendix. The Joint Appendix? Petitioner's Appendix, 78, sorry. Too many briefs, sorry. 78. And what do you want us to read there? Well, there was a question about whether that was actually the language, was it subject to those rights. The last full paragraph, subject to those rights for railroad purposes as it had been granted to the railroad under the 1875 Act. The 1875 Act, what was given to the railroad was a right-of-way.  The 1875 Act was a right-of-way, and it was a right-of-passage in easement. It just, as I'm seeing the 1875 grant, it was the right-of-way through public lands. Well, yes, and as the government argued in Great Northern, that that was, that right in the 1875 Act was a right-of-way, and it was a right-of-passage in easement. Kagan. Mr. Leckner, I know Great Northern said so, and that's surely very strong support for your view, but why did Great Northern think that there was a difference between pre-1871 grants and post? First, the shift in Congress's policy, and the railroads fell out of disfavor, and Congress passed resolution saying, you know, we want to hold on to these lands to secure homesteads for actual settlers. I mean, I guess I had thought, if you were just dealing with this as a matter of first impression, that the shift in Congress's policy was a shift about whether to give away, you know, huge swaths of land to the railroads, and that Congress indeed decided enough of this, we're not going to give these checkerboard grants of land to the railroad because they're making a mint from this, and we'd rather give it to homesteaders. But there was — I don't see any evidence that there was any shift in policy or any reason why there would be a shift in policy as to what the rights-of-way were, whether they were easements or whether they were limited fees. Well, Section 4 has a lot to do with that, and that is where Congress reserved the right to dispose of the underlying lands to the settlers. That provision is not found in the pre-1871 railroad grants. And this Court in Great Northern looked at that, and you say you've got to look at Section 4. That provides light on how to interpret the right-of-way grant in Section 1. And because of Congress's intent and the legislative history surrounding similar language when Congress passed it in 1872, they called it the right-of-way is merely going to be an encumbrance. I guess, you know, again, if you were just looking at this as a matter of first impression, the language of Section 4 does not seem to me to be very indicative of anything. You know, it says subject to the right-of-way. Subject to the right-of-way, whatever the right-of-way is, subject to the right-of-way if it's an easement, subject to the right-of-way if it's a limited fee, doesn't seem to pick one or the other. But as the government argued in Great Northern, it would be silly to patent the underlying land subject to a fee. I mean, there would be no reason for that language at all if the railroad got a fee and then you patented the — in effect, it would be the adjacent land, not the underlying land. There would be no reason to say that the adjacent land is subject to a fee, because at the limited fees, they were envisioning those things going to the center of the earth. So you'd be patenting the adjacent land. But under Section 4, and as Great Northern interpreted, the patents go to the underlying land, and that's what happened in this case, because Brand owns the underlying land and minerals. Kennedy, in your answer, it seemed to me, and maybe you have to do this properly, that you confused limited fee with fee simple, with absolute fee. Now, obviously, that's true if it's the same owner. They merge. Well, I was using limited fee in the context, as this Court used it in Townsend, limited fee with the implied condition of reverter. I mean, even in the Townsend in 1903, the railroad got it all, but it was subject to an implied condition of reverter if they stopped using it for railroad purpose. But they did get fee simple absolute to the center of the earth, is how it was construed at that time. So that sheds light on the fact that Section 4 reflects that only an easement was granted because you would not need to have a subject to language at all if you were just patenting the adjacent lands. It is also well established that the Department of Interior's interpretation of public land laws, such as the 1875 Act, is entitled to great deference. This is because public land laws provide for the acquisition of title, which must be secure. And beginning in 1888 and continuing through today, the Department of Interior still construes 1875 Act as easements, and they can still construe 1875 Act rights in ways different from pre-1871. Scalia I don't understand how that can be, and yet the government can argue contrary to what the government says. I mean, is that what you're telling us, that Interior says one thing and the Justice Department here says something else? I mean, you have a President who reconciles these two things, and he must agree with one or the other. Verrilli, I think under this Court's precedent, you defer to the agency in charge of administering 1875 Act, and that is the Department of Interior. And the Department of Interior has consistently interpreted these rights away as easements, and that interpretation is entitled to substantial deference. Scalia I'm sure the government will have an explanation of why we shouldn't. Verrilli, if it pleases the Court, I'd like to reserve the remainder of my time for rebuttal. Roberts Thank you, counsel. Mr. Yang. Yang Mr. Chief Justice, and may it please the Court, the statute, its legislative history, the surrounding statutory context, which includes Section 912 as well as the 1906 and 1909 Acts, and this Court's decisions construing the 1875 Act, including Section 4, which predated Great Northern, show that the United States retains a reversionary interest in the surface of the land of right-of-ways granted to railroads. Alito Mr. Yang, I have to say I think the government gets a prize for understatement with its brief in this case. You have a sentence in your brief that says, We acknowledge that there is language in this Court's opinion in Great Northern, and in the government's brief in that case that lends some support to Petitioner's contrary argument. Here are the subject headings of the government's brief in Great Northern. The right-of-way granted by the Act of March 3, 1875, is in the nature of an easement. The language of the 1875 Act shows that only an easement was granted. The legislative background and history of the 1875 Act show that the grant was of an easement rather than a fee. Subsequent administrative and congressional construction confirm that only an easement was granted. I mean, the first sentence of the summary of the argument is  And there are also other portions of the brief. I would refer the Court, for instance, to footnote 4, where the government said there would be a separate question raised about whether a patent holder, subsequently who obtains the patent after the grant of right-of-way, would take this government interest. And the government said, in fact, that would raise different questions. The Court recognized that on pages — the last two pages of its opinion. It specifically limited its judgment to situations where the government retained interest in the entire surrounding parcel and, in fact, modified the judgment below, which enjoined the railroad from oil drilling, simply to apply to that. Not only that, the Court was writing on a — the Court — the government didn't cite, for instance, Scalia. Scalia, but before you go, you think that — you really think the Court was saying it will be an easement when that suits the government, but it will be something else when that suits the government? I mean, it's either an easement or it's not an easement. Do you really think the opinion meant to reserve the question whether it was an easement? Yang, I do with respect to the issue that we have here. The question before the Court was whether the right-of-way, which is a statutory term, Congress could have used easement, it could have used fee, it did not. It uses a special statutory term which has accumulated meaning over time in the — particularly in the railroad context. And in that context, the Court was deciding whether it was in the nature of an easement, which is our subject heading said, it's in the nature of an easement, but that's vis-a-vis the United States'— I have the alibi. I got that for you. With respect to the mineral lands. And in fact, the shift that, Justice Kagan, you were talking about is a shift about subsidies. It was a shift of subsidy away from these lavish land grants. And when Congress was stopping that lavish grant to railroads, it made no sense to construe the Act with respect to the mineral rights, which the Court said were mineral riches. Why would Congress do that when it was cutting back on the subsidies? Alitos, that may be, but the term easement is a well-known term with an established meaning. And you're saying that you said it was an easement, the Court said it was an easement, you persuaded the Court to say it was an easement, and now you're saying this is some kind of property right that has no name, previously unknown to the law. It's a right-of-way. And in fact, the government's brief also said that with respect, and I'm quoting from page 9, with respect to the surface, under any of the theories, even under the easement theory, which I don't believe is a true common law easement, the railroad's control of the surface was complete. And then we went on further, and this is on pages 36 and 37, it said it was a fact that the right-of-way has some of the attributes of a fee, and those included exclusive and perpetual occupation and the remedies of the fee. Breyer, let me put it this way. And so, again, if we were to rewrite our brief, we would certainly do so much more carefully now. But I think that the way that you read the brief is the way that you read opinions, which is in context in which it was decided, particularly because Footnote 4 and this Court's opinion responding to Footnote 4 made clear that they were only addressing mineral rights where the United States held the surrounding parcel. And that's particularly true, because this Court had already construed section 4 of the 1875 Act before Great Northern in Stalker and in Steinke. And in Stalker, the Court held that the subject to, this is on page 154, a patent was subject to the railroad rights acquired by approval, that's the approval in section 4 and the subject to language in section 4, upon approval, the grounds so selected were segregated from the public lands and the required interior to withdraw the land granted from the market, and then the Court goes on, and this is on page 154 again, the later patent, the patent issued to a settler, even though the local land office forgot to or omitted to mark the right-of-way on the land plats, the subsequent patent was inoperative to pass title to those later patent holders. And then in Steinke, this is 1922, the Court followed Stalker and said the approved map under section 4 is the equivalent of a patent. And then they go on to say, citing Stalker, that the later patent was inoperative to pass title. And I think it's important, in both of those cases, the Court cited two interiors regulations. In Stalker, the Court quoted at length the regulations from 1888, which, although the Court suggested that in Great Northern those were the first regulations, they actually weren't. There were prior regulations in 1878 which discussed nothing about the nature of the fee, and those, unfortunately, are hard to find. They are in Senate Executive Document 30, 45th Congress, Third Session, 1879. So, but the regs that Petitioners now rely on were specifically referenced by the Court, including the regs that say the disposition of the land surrounding the right-of-way is subject to the right-of-way. Kagan, the Petitioners say that there are thousands or even tens of thousands of people in their position. Do you dispute that? We don't have good numbers, actually, on that. Breyer, what are the numbers? Look, this is what I'm thinking. This is property law. It's not just a question of trying to work out what the case could or couldn't have stood for. If I try to remember my property class, it vaguely was, which was a great class, A. James Kasner, real expert. And he, I think, said that when you convey subject of divestment, the fee, the something called season under the common law went to the recipient of the conveyance. But if you conveyed an easement, season did not pass. So in holding that it is an easement, you're holding there was no season, and therefore it couldn't be a divestiture. Now, whether that's true or not, or I've misremembered it, I'd go back to Justice Scalia's question. Is there a single example since the Doomsday Book, since De Donis, since the Bracton case, where a court has interpreted an ambiguous phrase, which doesn't say, to grant an easement for one purpose but not for the other? There may be some, but I didn't notice any cited in the government's brief. I'm not sure that there would be any common law cases. No, I said in any way, any case at all.  Breyer, what is the case? I'd like to read it. With respect to the pre-1871 statutes, the court would sometimes. Oh, but they had a different view. No, no, no. They didn't say it was an easement. I did read. They did. It did? They sometimes referred to them as easements. Which case? I don't have it in front of me. I know that the. Where is it roughly in your brief? We didn't refer to those cases. Oh, all right. We might have cited the cases in our brief. We didn't refer to that part. I'm not surprised. But you think there are some? I'll get my law clerks to look at them. There are some, but the point was they were trying to discuss the nature of a statutory right-of-way. Congress did not use the term easement, did not use the term fee. And so the Court has been using common law terms which don't fit perfectly to describe certain cases. Can you imagine or explain to me why a property lawyer worth his salt, since 70 years ago, more, 1942, wouldn't have read that case and advised his client, who was a property lawyer, who was buying the land, if the railroad abandons it, it's yours? Yes. There are at least four reasons. They're not reasons. I want to know if there's any authority and then give me the reasons. There's both statutory and case law authority. I would start with Stalker and Steinke, which specifically say that when you have approved the map, it's equivalent to a patent, and then, therefore, any parcel subject to the patent or the right-of-way, which means you don't get any interest, at least in the surface of the right-of-way. So those cases have never been overruled, one. Two, Congress in 1906, and this is insignificant, this is at page section 940, at page 6a and 7a of our brief, Congress said that each and every grant of right-of-way under this 1875 Act, each and every one, shall be declared forfeited if they hadn't been constructed, and, this is important, the United States resumes the full title to the lands covered thereby, free and discharged from such easement. Did they give compensation to the people to whom they pronounced that? No. That can't change the meaning of the 1875 Act. But it reflects Congress's understanding of what the 1875 Act. Scalia, it reflects a later Congress's understanding of what an earlier Congress did. We don't interpret statutes on the basis of what later Congresses think they meant. This Court did in Great Northern. In fact, this Court did in Great Northern. You wouldn't have done it. Okay. That's possible. But what we're talking about is Great Northern, and, in fact, Great Northern quotes this language of section 940. The very next section goes on to say that the government's interests shall inure to the benefit of the land conveyed by the United States previously, which was subject to the right-of-way. So that section itself shows that starting in 1906, and that's both 1906 and 1909, Congress understood that the government had a reversionary interest. Kagan, can I take you back to my question? Sure. Thousands, tens of thousands, how many people are involved here, how many acres of land? Again, we don't know, because the way that these things are disposed of, there has not been a centralized way of tracking it. It could be a significant amount, because the 1875 Act rights-of-ways were at least in number the most numerous. There were — it's hard to know about mileage, because the specific land grants were often quite long. But in terms — there were at least a significant number of 1875 Act rights-of-ways. And so going back to Justice Breyer's question about why a good lawyer would not have a great pause about saying that you got the surface interest, you have Stalker and Steinke, you have Section 940, which was enacted in 1906 and 1909, you have Section 922 — Section 912, which was enacted in 1922, which the Court has already discussed, which shows that whenever there is a forfeiture, the United States interest reverts to first for roads and then to municipalities, and if there was anything left, it would go to a landowner. That, you know, was unquestioned, it appears, until — at least with the surface interest, until the mid-1980s. For 60 years, municipalities and roads were the highest interest. Breyer, I see that they do, and I certainly think bicycle paths are a good idea. But the problem that I see here is just what Justice Kagan is bringing up. That is, as I read this, I think there might be, you know, millions of acres. In the last 70 years that have been conveyed, for all I know, there is some right of way that goes through people's houses, you know, and all of a sudden they are going to be living in their house and suddenly a bicycle will run through it, which isn't so bad. But I'm concerned about that, and your answer makes me more concerned. Because you haven't suggested anything that makes me think there aren't millions and millions of acres involved. Now, what are you going to say that would disabuse me of that? I'm saying that between 1922 and the mid-1980s, this issue does not appear to have arisen. It's arisen only with respect to the right of way. Exactly, because the lawyer would think, when he reads the case of Great Northern, he would think it's an easement. And then when the city takes the road, or when the municipality, excuse me, when the municipality takes the right of way, no one complained for 60 years? I mean, this is the background of the law. This is going to be a significant issue. How much is that? How much roughly is that? How often has it turned out that there was a conveyance after 1942, there was a conveyance to an abandoned right of way by the United States to land that had previously been granted to a private owner? The amicus brief of. How often? Again, we don't have good numbers on how often. I know you don't have good numbers, but can you give me a rough estimate? I think a significant amount of time, because the the – if you look at the amicus brief of the National Council on State Legislatures, they explain this as just 10 times as much reliance on the one side than the other side. Is that totally wrong? Your Honor, I can't speculate on numbers. I just don't have the – it would be not appropriate for me for the United States to speculate on numbers. Do you think – Ms. Ewing, would you clarify what your – Mr. Lesner told us? He said, to this very day, the Department of Interior has taken the position that these railroad right of ways are easements. That's not correct, because it needs to be qualified. After – after Great Northern, Interior has concluded in Amarato Hess, which we cite in our brief, that the subsurface interests would go to the patentee. But with respect to the surface interests, that has not been the case. In fact, until 1984 is the first case that I've seen in the – in a case that was the counterpart to the Oregon short-line case that we cite that led to the decision here. There was – it just wasn't disputed about the surface interest. Why then did no one from the Department of the Interior join on – join your brief? They agree with our brief. We don't always – They don't have a choice, do they? I mean, it's – No. We have been in close consultation with the Department of Interior, and they have signed off on this brief. The agency that's at issue here is actually agriculture, because agriculture is the Forest Service, which has the lands. I think that's a little unfair, Justice Scalia. I think the government is giving the Court its view of the law here. We're interpreting it. Multiple agencies have been consulted, and we've been trying to come to grips with the Court's conflicting, you know, language. If you take language in the abstract and you divorce it from the context of the case, the Court's decisions are conflicting. But when you look at the context of the case, you look at Great Northern as with respect to saying that the subsurface interest, the mineral interest, are like at an easement with respect to the United States vis-a-vis the railroad. But then you have Stalker and Steinke saying that when under Section 4 of the Act – and it's an authoritative construction of Section 4 of the Act – when you – when you approve a map of a railroad under Section 4, it is tantamount to a patent and thereafter a subsequent patent does not confer an interest on the – on the patentee, those cases are reconciled, we think, by acknowledging that Stalker and Steinke control at least with respect to the surface interests. And then with respect to the subsurface interest, Great Northern clearly says that at least vis-a-vis the United States and the railroad where there's no third parties involved, that is deemed to be like a railroad – an easement that would not give a subsurface interest. And there's real reason – important reasons to distinguish between the subsurface and the surface with respect to rights of ways. Surface is what's all – for the right of ways, what's important, it's critical. You need to have a artery that connects various parcels of land. That was true back when 1875 was enacted, and it's true now with respect to highways and other uses that the government might put its land to. Kagan. The patent here, Mr. Yang, which was what, in the mid-1970s, did not reserve anything. The government just made an unequivocal grant to the Brandt family. Yang, and that was true both in Stalker and in Steinke with respect to the subsequent patent. Kagan. Well, I'm just suggesting that after Great Northern and then you're given this patent, which is unequivocal and does not reserve anything, why anybody would think that they hadn't gotten the whole ball of wax is a mystery. Well, I think you would have to, if you had a good lawyer, the good lawyer would say, look, we've got, there's uncertainty here. You've got Stalker and Steinke, which says you get no interest. You have Great Northern, which doesn't address interests that pass to third parties. It only addresses the interest that the railroad has, and it says there's no mineral rights. And then you have Congress in 1906, 1909, 1922, and more recently in 1988, doubling down, saying, you know, the United States' interest goes to roads first. It seems to me a fair reading of the history here, Mr. Yang, is that it really didn't occur to the government until very recently that these rights of way had value as anything other than railroad tracks, and indeed that the government was anxiously trying to give these things away because it thought these spaghetti strips of land, it's of no use to the government, here, take them, get them off our hands. And, you know, having done that for many, many, many decades, the government faces a problem when it turns around and says, you know what, we forgot there were bike paths. Yang, I don't think that's quite accurate. At least since 1922, the government has disposed of the Congress, I should say, has directed the government to dispose of its reversionary interest first to roads, and that remains true today. And then also, from 1922 until 1988, it was supposed to go to any municipality. Any land within a municipality goes to the municipality. And then third, the — it would go to any landowner of the surrounding parcel that was — contained the interest subject to the right-of-way. Now, of course, you know, Congress is free to choose to change its decision about how to dispose of U.S. government interest, any government property. There is no vested interest in that. And I think what we're trying to say in our brief is that Petitioner asked the Court essentially to nullify a significant — significant enactments by Congress. It would nullify.  Breyer. It's true, but look, when you talk about — I mean, I went and read when I read. I thought your brief was very persuasive, and then I read Great Northern, and I thought they have — they're really quoting it correctly. Here's what they said about the cases that you refer to, like Springer. The conclusion that the railroad was the owner of a limited fee, which is the conclusion of those earlier cases, was based on cases arising under the 1871 Act, not the 1875 Act, and the change of policy in 1875 was brought — was not brought to the Court's attention. And then they say that conclusion is inconsistent with the language of the 1875 Act, its history, and its early administrative interpretation. We therefore do not regard this earlier case as controlling. That was Townsend which was dictum. We told the Court that Townsend was dictum, and Townsend, the dispute was by a railroad who got a decree from a State court saying it had the right-of-way. Breyer. I thought they say in the Stringham case, is that the same as Townsend? Oh, I'm sorry, Stringham. Well, that's the one you were — No, no, we're not relying on — we're relying on Stalker and Steinke, which are 1875 Act holdings. It's this Court construing the very statute that we're talking about, section 4, which is the very section that the Petitioner is. Now, it would be kind of remarkable to read language in Great Northern which addressed a different question in which the government specifically reserved the question of what interest would transfer to a patentee. The Court specifically limited its decision, so it wouldn't reach that issue. And then sub silencio overruled two decisions by this Court on the very statute decided 30 years earlier when the Court was closer to the 1875 Act. That would be a pretty remarkable thing, I think, and what we're saying is that, no, Stalker and Steinke remain good law. Even if you characterize the right-of-way as having attributes of an easement, because it's clear it can't be a common-law easement. I don't think that even Petitioner may be able to dispute this, but a common-law easement, as this Court has explained, would not give, as traditionally framed, exclusive and perpetual occupation to the railroad. It would not give the remedy of the fee. All those are very practical, real rights that would have to be conferred that would be greater than a mere common-law easement. And that's true back in 1871, and it's true in 1875, and we said it was true in our brief to this Court. We said, as an easement, you know, the fact that it has some of the attributes of a fee, including exclusive and perpetual occupation and the remedies of a fee and not an easement, doesn't take it out of the box of what we were talking about in that case. And so, again, I think you need to read it in context. I agree that if you just take Great Northern and look at it without peeling back the hood a little bit, there's language that, you know, would lead to this. Breyer, that's basically my problem, and I guess you just don't have any specific things of what property lawyers were saying, but those two cases are from the era of Stringham. And at that point, apparently, the Court thought it was a limited fee. And then you get, they were all, wait, was any of them after Great Northern? No, not after Great Northern. So then in Great Northern, it comes along. But, Justice Breyer, I think it's a mistake to rely on these labels of limited fee and easement too strongly. That's what this Court basically said in Union Pacific in 1957. In Union Pacific, the Court said, look, these pre-1871 cases use the term limited fee, but really we're not going to deem that to be controlling with respect to the mineral rights. And the Court is doing exactly what we're saying should be done here, which is you understand the right-of-way in the context of the statutory text, in the context of the environment, the surrounding statutory environment in the context of this Court's decisions, and it's not a binary black or white choice between, you know, common law terms. Congress didn't use those common law terms. Congress used the term right-of-way. It used the same text that it did in prior grants of rights-of-way. And all we're trying to say is that there are real important interests here. It's not practically feasible to ever reconstruct these arteries through the lands. And they were important when Congress granted them to develop the lands in 1875, and they remain important today as Congress has now repeatedly recognized in terms of granting public roads. So do we know how many miles of public roads and how many miles of bike trails have been, you don't know that either? On bike trails, this is not a Rails-to-Trails Act case. There are different issues there. On the Rails-to-Trails Act case, you know, it's — I don't have a mileage, but this is a trail that, in this case, the government used its property interests through the national forests as well as through this parcel for like a 22-mile trail. There are probably thousands of miles of trail that are — that would be affected. And importantly, there's a lot of interests going forward that would be affected. When the law, again, the law of 1922 was that the Congress would reserve the United States' interests for roads and municipalities, and that was a significant thing. Kagan. Are there highways that would be affected? I mean, if we rule for the Brants, are there suddenly going to be highways that can't be ruled to be highways anymore? It certainly would call into question the legality of the land transfers. And I'm sure that could be something that could be litigated. There would be issues, I'm sure, defenses raised by the States and municipalities. But what the Court would be saying is that for — since 1922, and this policy continues now, that the highways that have been created under 1875 Act would be invalid. Breyer. Can you think of anything I can do about this? It's a case, in my mind at least, where reliance interests on a previous case in the property law area are important. And yet none of the briefs here really gives me a reasonably concrete idea of how much reliance there's been. And so I'm somewhat in the dark. Yeah. It's difficult to know, because again, these are kind of ad hoc things. When there's an abandonment, there might be proceedings, but there's been — we've not been able to obtain centralized, reliable information on the total number, because this goes back a pretty long way. We're talking about, again, starting in 1922. You know, this has been unchallenged until we got two district court decisions in the mid-'80s with respect to the surface. Now, on the subsurface, Great Northern has, you know, continued to be applied by Interior, and that's been treated differently. And I think it's important also to remember that the regulations, not only were they cited by this Court and Stalker and Steinke, the Court was clearly aware of the regulations. In 1931, the case called Otis Birch, where Interior basically followed Stalker and recognized that you could not pass title. Now, that was a Mineral Act case, and the Interior also said that because you can't separate the estates or there's no reason to separate the surface from the subsurface, the mineral couldn't be transferred either. That's been overtaken by events. But it's important to recognize in 31, and when the regs were codified in the CFR 138, which are the 1909 regs, which had never been changed or revisited on the nature of the interest, they simply just carried forward, even though Interior recognized that there would be no interest given to patentees of the land after a right-of-way is granted under Section 4 of the Act. Roberts. Maybe the reason you don't have records on this, which strikes me as pretty unusual, that the government doesn't know what it owns, is that for decades you didn't think that you owned a reversionary interest. Well, for decades we thought we owned a reversionary interest. It's just Congress. Well, you don't even have any records on where these things are. Well, but Congress told us, told everyone how to dispose of it. It went to streets, roads, highways, then to municipalities, and if then not municipalities, it would go to the landowner. So the United States, you know, disposed of its reversionary interest through statute. It wasn't until 1988 that the policy changed to prioritize highways and then the U.S.'s interest after that. So it's understandable why we haven't been intimately involved with all these forfeitures that have occurred over time. Congress directed how the United States' interest should be disposed of. Ginsburg. What would be the exposure of the United States if you lose? Are there takings claims now? There are takings claims that would any 1875 Act case, a right-of-way which has been abandoned, which is then put to another use, whether it be a highway under the current section 912, or whether it reverts to the United States, or even if, for instance, it doesn't revert to the United States. Are there any statute of limitations? Would all of this be subject to the APA or a claim for damages against the U.S.? I don't believe the APA would govern a claim of damages against the U.S. There are takings claims which proceed under the Tucker Act against the U.S., or the Little Tucker Act, depending on the amount. It wouldn't be an APA issue. Scalia. What about adverse possession? Can't the guest say that? Adverse possession is certainly an issue that might come up. I would think if there's been no objection to these spaghetti strips of land, I don't think condemnation would cost the government a whole lot for that matter. What, you know, what spaghetti strip of land through? We faced a very considerable amount of litigation in recent years. Doesn't Interior or somebody else, I mean, doesn't the highway, aren't there people in the government who keep track of where the highways are built? Well, for local roads? I mean, this is the idea that these rights-of-ways would go to States and localities, not Federal highways. That's section 912. But you should know how much land the United States owns. It's incredible that there's no record in the Interior Department or anywhere else of what land the United States owns. You claim you own these thousands of acres, and you say we've not kept track of it. We just know where it's going to go, but we don't know what we own. There are some records that you can get from archives with respect to specific things, but it's not centralized. We don't have a way of aggregating what has happened over the last 90 years. That's the difficulty that we have here. Roberts. Thank you, counsel. Mr. Lechner, you have 4 minutes remaining. We do know how many acres are involved in this case, and the government is claiming 10 of the 83 acres that it patented to Marvin Brandt's parents. As this Court has noted, stare decisis concerns are at their acne in cases involving property rights. With respect to Stalker and Steinke, those were pre-Great Northern. Those were limited fee cases. At most, they stand for first in time, first in right. Steinke was written by Justice Vander Vanner, who also wrote Stringham, which Great Northern overturned. That's why Stalker and Steinke fell out of use over the years, and if Stalker and Steinke fell out of use, the government should have brought those cases to the Court's attention in Great Northern, but it didn't. With respect to the 1931 land decision the government just brought up, I refer to the Court to solicitor's opinion. Yes, it would be the private parties that would have brought it up in Great Northern, wouldn't it? And do you have any light to shed on the comparative amounts? I mean, they're saying, for all we know, there are billions of dollars' worth of takings claims that will come up with where the highways run, and you're arguing, of course, any reasonable property lawyer would have relied on Great Northern to think it was just conveying an easement. But, you know, I'm not a property lawyer, and so what actually happened matters, and the amounts matter, at least to me. And do you have any light to shed? I don't have any light to shed on the actual mileage. We know it's thousands. We know that this is a big issue. Breyer. What about on your side? What about the possibility that millions of acres has been conveyed, and there are a lot, tens of thousands or hundreds of thousands of abandoned railroad that property lawyers thought went to the person who bought them, and run through somebody's house? I mean, is that a figment of my imagination? And you won't say no, it isn't, and therefore, I'm asking you, is there any empirical support anywhere for how property lawyers treated Great Northern, how much was conveyed, et cetera? Anything you can say on that would be helpful. I have nothing to say about the quantity, but I know that when S.G. the Seventh Circuit ruled in S.C. Johnson that the title insurance thought that was a landmark decision because it resolved a lot of problems with the title insurance industry. Each mile of the right-of-way takes up 24 acres. At one point, there were 270,000, as this Court noted in Perceau, there was 272,000 miles of roads at the peak in the early 1920s, and about 130 of those have been abandoned by the time of the Perceau decision. I want to also address the forfeiture provision that they mentioned. And Great Northern relied on section 43940 to confirm its conclusion that, yes, indeed, these are easements, because 43 U.S.C. 940 calls them an easement. And they all — as with respect to land that the government still owned at the time of abandonment, they said that the government's land would be discharged of the easement. Kennedy, is there any doctrine in property law that if a right of access is granted and it's to the exclusion of all other uses, it's — it looks for all purposes like absolute control, that it ceases to be an easement and becomes a limited fee? I mean, is there some magic that takes place in property law so that if there's a grant that conveys such total control, that it is construed not to be an easement? I don't know of any. I've never seen it. You know, roads, highways are conveyed in— Have you even heard of the term limited fee until this case? I never heard of it. Well, I read— A. James Kasner didn't talk to me about a limited fee. Well, I read these in law — these cases in law school, so I was aware of the term. Thank you. Thank you, counsel. The case is submitted.